**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

TONJA CHURCH SPENCER,

               Plaintiff,

    v.

NANCY A. BERRYHILL, Acting
Commissioner of Social
Security,

              Defendant.

CASE NO. CV 17-7592 SS

**MEMORANDUM DECISION AND ORDER**

**I.**

**INTRODUCTION**

Tonja Church Spencer ("Plaintiff") brings this action seeking to overturn the decision of the Acting Commissioner of Social Security (the "Commissioner" or "Agency") denying her applications for Disability Insurance Benefits and Supplemental Security Income. The parties consented, pursuant to 28 U.S.C. § 636(c), to the jurisdiction of the undersigned United States Magistrate Judge. (Dkt. Nos. 11, 20-21).  For the reasons stated below, the Court AFFIRMS the Commissioner's decision.

## II.

### PROCEDURAL HISTORY

On August 14, 2014, Plaintiff filed applications for Disability Insurance Benefits and Supplemental Security Income, pursuant to Titles II and XVI of the Social Security Act ("Act"), alleging a disability onset date of April 1, 2014. (AR 185-94). The Commissioner denied Plaintiff's applications initially. (AR 117-18). Plaintiff requested a hearing before an Administrative Law Judge ("ALJ"), which took place on July 6, 2016. (AR 36-64, 123). The ALJ issued an adverse decision on August 15, 2016, finding that Plaintiff was not disabled because there are jobs in the national economy that she can perform. (AR 22-31). On August 18, 2017, the Appeals Council denied Plaintiff's request for review. (AR 1-6). This action followed on October 17, 2017.

## III.

### FACTUAL BACKGROUND

Plaintiff was born on February 2, 1963. (AR 39, 185). She was fifty-three (53) years old when she appeared before the ALJ on July 6, 2016. (AR 39). Plaintiff has a ninth-grade education. (AR 39). She is divorced and lives with friends. (AR 39, 185). Plaintiff last worked in December 2012 as a telemarketer. (AR 225). She alleges disability due to epilepsy, arthritis, heart condition, depression, and memory loss. (AR 224).

## A.    Plaintiff's Statements and Testimony

On September 10, 2014, Plaintiff submitted an Adult Function Report.  (AR 237-44).  She asserted that she is unable to work due to chronic, constant pain.  (AR 237, 244).  Her impairments affect her ability to sleep, dress, bathe, clean, feed herself, and take medications timely.  (AR 238-39).  Plaintiff is able to drive, shop, and manage her own funds.  (AR 240).  During the day, she reads, watches television, and socializes with friends and family.  (AR 241).  Plaintiff asserted that her impairments affect her ability to lift, squat, bend, stand, reach, finger, walk, sit, kneel, climb, concentrate, understand, and remember.  (AR 242). Plaintiff uses a cane to ambulate and is able to walk only 10-20 steps before needing to rest for 10-20 minutes.  (AR 242-43).

On September 12, 2014, Plaintiff submitted a seizure questionnaire.  (AR 245).  Her last seizure was in August 2014 and she experiences two to three seizures every month, usually in her sleep.  (AR 245).  Following her seizures, she suffers from nausea, soreness, disorientation, and headaches.  (AR 245).

At Plaintiff's hearing, she testified that she is unable to work because of pain in her neck, back, and feet from her arthritis and spinal stenosis.  (AR 41,43).  Plaintiff also experiences tightness in her chest and shortness of breath from her cardiac issues, poor sleep, seizures, residuals from a stroke in 1995, triggering of her right middle finger, frequent headaches, neck tightness and pain, memory problems, COPD, kidney problems, and

3

for the past six months, speech problems. (AR 43-47, 55-58). Plaintiff's feet are painful, particularly the heel and arch, which feels like "pins and needles," like her feet are "on fire." (AR 50). Plaintiff described her pain as 6-7/10 despite taking Tylenol and 2400mg of Neurontin daily. (AR 43). She denied any side effects. (AR 43). Plaintiff reported a history of smoking marijuana for "medical" reasons but acknowledged it was not prescribed by a doctor. (AR 46-47).

Plaintiff initially testified that her seizures are fully controlled with medication, but later testified that she had a seizure the week prior, while in Georgia, and has had eight to ten other seizures over the prior year, usually while she is sleeping. (AR 44, 46, 52-54). Her seizures cause fear, uncertainty, and headaches for up to five hours. (AR 53). Her primary care doctor referred her to a neurologist, who in turn referred her to a cardiologist. (AR 54). She has not followed up with neurology because they have not returned her call. (AR 49).

Plaintiff asserted that she has to change positions frequently to stay comfortable. (AR 49). She spends most of the day either reclining or in bed. (AR 51). She needs a motorized cart to go grocery shopping. (AR 50-51). Nevertheless, other than needing a wheelchair to get to the gate, Plaintiff was able to take a nonstop flight from Los Angeles to Georgia the week prior to her hearing. (AR 58-59).

## B.   Treatment History

Plaintiff has a history of depressive disorder, polysubstance abuse with past use of marijuana and cocaine, hypertension, strokes, and seizure disorder.  (AR 285, 297).  In July 2013, Plaintiff presented to the emergency room with suicidal ideations. (AR 282).  She also complained of chest pain and was admitted to the hospital from July 15-19 to undergo a cardiac cauterization procedure.  (AR 295).  Plaintiff was hospitalized again from August 12-16, 2013, with complaints of chest pain.  (AR 327, 332).

On July 18, 2014, Plaintiff presented with complaints of hip pain.  (AR 356).  On examination, Plaintiff had normal range of motion, pain during motion of her right hip, tenderness, and weakness in her left lower extremity.  (AR 357-58).  An x-ray revealed arthritis of the right hip.  (AR 358).  On July 29, Lionel Paul Bourgeois, M.D., prescribed medication and ordered a follow-up in five weeks.  (AR 381-83).  In August, Plaintiff presented to the emergency room on multiple occasions, complaining of bilateral hip pain, which she reported as 10/10.  (AR 363, 365, 369, 376, 389).  On August 5, a physical examination was largely unremarkable. (AR 392-93).  While Plaintiff exhibited a left-sided limp, she had full range of motion in her neck, back, and hips, with normal strength and reflexes and no cranial nerve or sensory deficits.  (AR 392-93).  On August 16, she was positive for myalgias, back pain, arthralgias, and a gait problem.  (AR 370). On September 2, Plaintiff reported ongoing issues with back and hip pain.  (AR 422).  Dr. Bourgeois ordered an MRI.  (AR 401).  A

urine drug screen was positive for cannabinoids. (AR 406). An MRI of the lumbar spine indicated scoliosis of the lumbar spine with degenerative changes and spinal and foraminal stenosis. (AR 431). The imaging also revealed that Plaintiff's right kidney was atrophied. (AR 431). Plaintiff was referred for neurosurgery. (AR 434). On September 30, Plaintiff reported lower back pain, radiating to her right leg. (AR 432). On examination, she had normal range of motion, with the ability to leg raise and rise on her toes and heels without pain. (AR 433). She had some pain in her heels while standing. (AR 433).

On November 5, 2014, Carlos Kronberger, Ph.D., performed a mental status examination on behalf of the Commissioner. (AR 436-39). Plaintiff reported "constant pain" from her epilepsy and chronic osteoarthritis. (AR 436). She asserted periodic seizures since 1995, with her most recent one a month prior to the examination. (AR 436). She reported frequent headaches, stomach aches, and back pain. (AR 438). Plaintiff was prescribed Gabapentin, Lisinopril, Lovastatin, Baclofen, Norco, and Trazadone. (AR 436). She complained of depression because of an inability to care for herself physically. (AR 436). Plaintiff acknowledged that she regularly consumes alcohol and marijuana. (AR 437). Plaintiff is able to dress herself, shop for groceries, drive to work, and occasionally cooks. (AR 437). She knows how to pay bills and manage funds but requires reminders. (AR 437). She has no social activities and rarely does any household chores because she cannot stand for very long. (AR 437). Plaintiff

denied hallucinations, referential thoughts, paranoid ideations, and suicidal thoughts. (AR 438).

On examination, Plaintiff maintained a normal gait and posture, with no tics, tremors, or involuntary movements. (AR 437). No pain-related postural adjustments were noted. (AR 437). Her speech was intelligible and her language skills adequate for communication. (AR 437). Plaintiff's thought processes were logical and coherent, she maintained eye contact, she was able to understand directions and exerted adequate effort, she did not exhibit any unusual mannerisms, but she was moderately inattentive on tasks. (AR 437-38). Her affect was downcast and she was despondent and anxious. (AR 438). Dr. Kronberger concluded that Plaintiff was "adequately oriented, although she did not know one of three states that are adjacent to Louisiana." (AR 438). Her communications skills were adequate and she was able to understand directions. (AR 438). Dr. Kronberger opined that Plaintiff "is limited in her daily activities by physical condition and pain." (AR 439). He diagnosed major depressive disorder, unspecified anxiety disorder, psychological factors affecting physical condition, and cannabis use disorder. (AR 439).

Plaintiff began treating with Eugene Soroka, M.D., in August 2015. (AR 457). Plaintiff complained of back and hip pain, but otherwise feeling the same with no adverse effects from her medications. (AR 456). She acknowledged consuming alcohol occasionally and smoking marijuana. (AR 456). On August 10, Plaintiff complained of worsening back pain and abnormal speech,

associated with headaches. (AR 458). On examination, Dr. Soroka noted mild lumbar tenderness. (AR 458). He prescribed Norco and referred Plaintiff to a neurologist and a pain specialist. (AR 459). A renal and bladder ultrasound indicated that Plaintiff's right kidney was heterogeneous and mildly atrophic, her left kidney was consistent with Plaintiff's history of renal disease, and her bladder was normal. (AR 475). On August 21, Plaintiff reported continuing back pain. (AR 460). Dr. Soroka increased Plaintiff's Neurontin dosage. (AR 461). On August 26, Dr. Soroka refilled Plaintiff's Norco prescription. (AR 462). On December 9, Plaintiff complained of urinary incontinence. (AR 463). She was assessed with chronic obstructive pulmonary disease (COPD) and prescribed Advair. (AR 464).

Plaintiff began treating with LAGS Spine and Sportscape in September 2015. (AR 517). She complained of pain in her hips and right foot, which she assessed as 7/10 without medication, 4/10 with medication. (AR 517). Plaintiff reported disturbed sleep, pain radiating to her bilateral lower extremities, which is aggravated by activity and relieved with rest, and denied any side effects from her medications. (AR 517). She signed a pain agreement and was prescribed the "lowest effective dose of pain medication." (AR 517). Thereafter, Plaintiff was seen monthly for medication refills and injections. (AR 485-531). On December 1, a nurse practitioner found that Plaintiff was self-adjusting her Norco dosage and denied Plaintiff's request for an increased prescription. (AR 477, 502). Plaintiff was instructed to take her medication as prescribed. (AR 477). On February 10, 2016,

Plaintiff reported pain in her hips and lower back. (AR 493). On examination, she had reduced range of motion in in her lumbar spine. (AR 493-94). She was diagnosed with a hip flexor strain and prescribed rehabilitation exercises. (AR 494). On March 9, 2016, Plaintiff's drug screen was negative, which was unexpected given Plaintiff's Norco prescription. (AR 489). Plaintiff's Norco dosage was decreased and she was warned that her pain treatment would be stopped if this issue recurred. (AR 489). On April 7, 2016, Plaintiff received a trigger finger injection. (AR 487).

On October 30, 2015, Plaintiff presented to Ishu Rao, M.D., for a cardiology consultation. (AR 441). Plaintiff reported feeling "reasonably well" but noted some left-sided weakness, left facial droop, and speech deficits. (AR 441). A loop recorder was implanted on November 11, 2015, to rule out cardiac problems. (AR 443, 445).

On March 2, 2016, Plaintiff reported a change in her urine smell. (AR 465). A urinalysis was ordered. (AR 466). On March 7, 2016, Plaintiff complained of worsening insomnia. (AR 467). Otherwise, she was feeling the same and taking all her medications with no adverse effects. (AR 467). Dr. Soroka prescribed Trazodone. (AR 468). On April 11, Plaintiff complained of memory loss, associated with poor sleep and increasing stress and anxiety. (AR 469). Dr. Soroka increased Plaintiff's Trazodone dosage and started Clonazepam and Fluticasone.

On June 3, 2016, Dr. Soroka completed a physical RFC questionnaire. (AR 532-36). He reported that Plaintiff's impairments cause low back pain, shortness of breath, neck pain, and depression. (AR 532-33). He opined that Plaintiff's impairments would constantly interfere with the attention and concentration necessary to perform even simple tasks. (AR 533). Dr. Soroka concluded that Plaintiff can walk only ½ block before needing to rest and can sit only five minutes and stand only ten minutes before needing to switch positions. (AR 533). Plaintiff can sit, stand, or walk less than two hours in an eight-hour workday. (AR 534). He opined that Plaintiff is incapable of even "low stress" jobs. (AR 533). Plaintiff can rarely lift less than ten pounds and can rarely twist, stoop, crouch, squat, or climb. (AR 534-35). Dr. Soroka concluded that Plaintiff would likely miss more than four days a month due to her impairments. (AR 535).

## C.    **State Agency Consultants**

On October 21, 2014, James Williams, M.D., a State agency consultant, evaluated the physical health records and concluded that Plaintiff's epilepsy is a severe impairment. (AR 109). He concluded that Plaintiff can occasionally lift twenty pounds, frequently lift ten pounds, and can stand, walk, or sit six hours in an eight-hour workday. (AR 111-12). Plaintiff can frequently climb ramps or stairs, kneel, crouch, and crawl, and can occasionally stoop, and climb ladders, ropes, or scaffolds. (AR 112). Dr. Williams opined that Plaintiff can perform a limited range of light work. (AR 115).

On November 17, 2014, Robert McFarlain, Ph.D, another State agency consultant, evaluated the mental health records and concluded that Plaintiff's anxiety and depression are severe impairments. (AR 109). He opined that Plaintiff has a mild restriction of activities of daily living, mild difficulties in maintaining social functioning, and moderate difficulties in maintaining concentration, persistence or pace. (AR 110). Dr. McFarlain concluded that Plaintiff is moderately limited in her ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; and to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods. (AR 113). He opined that Plaintiff can perform routine, repetitive tasks and some semi-complex, non-repetitive tasks. (AR 114). Plaintiff may have some difficulty working in a high stress environment, but probably can function adequately in a medium-stress to low-stress environment. (AR 114).

D. **Vocational Expert**

The vocational expert ("VE") testified that Plaintiff's past relevant work as a telemarketer is classified as sedentary, semi-skilled work. (AR 59). The VE opined that with the Plaintiff's residual functional capacity (RFC), she could no longer perform work as a telemarketer, given that the job included quotas. (AR 60-61). Nevertheless, the VE concluded that Plaintiff has acquired work skills from her past work – using the telephone for business

purposes; providing customer service; and providing, obtaining, and recording information – that are transferable to other occupations with jobs existing in significant numbers in the national economy, including appointment clerk and telephone answering clerk. (AR 61).

## IV.

### THE FIVE-STEP SEQUENTIAL EVALUATION PROCESS

To qualify for disability benefits, a claimant must demonstrate a medically determinable physical or mental impairment that prevents the claimant from engaging in substantial gainful activity and that is expected to result in death or to last for a continuous period of at least twelve months. Reddick v. Chater, 157 F.3d 715, 721 (9th Cir. 1998) (citing 42 U.S.C. § 423(d)(1)(A)). The impairment must render the claimant incapable of performing work previously performed or any other substantial gainful employment that exists in the national economy. Tackett v. Apfel, 180 F.3d 1094, 1098 (9th Cir. 1999) (citing 42 U.S.C. § 423(d)(2)(A)).

To decide if a claimant is entitled to benefits, an ALJ conducts a five-step inquiry. 20 C.F.R. §§ 404.1520, 416.920. The steps are:

(1)   Is the claimant presently engaged in substantial gainful activity? If so, the claimant is found not disabled. If not, proceed to step two.

(2) Is the claimant's impairment severe?  If not, the claimant is found not disabled.  If so, proceed to step three.

(3) Does the claimant's impairment meet or equal one of the specific impairments described in 20 C.F.R. Part 404, Subpart P, Appendix 1?  If so, the claimant is found disabled.  If not, proceed to step four.

(4) Is the claimant capable of performing his past work? If so, the claimant is found not disabled.  If not, proceed to step five.

(5) Is the claimant able to do any other work?  If not, the claimant is found disabled.  If so, the claimant is found not disabled.

Tackett, 180 F.3d at 1098-99; see also Bustamante v. Massanari, 262 F.3d 949, 953-54 (9th Cir. 2001); 20 C.F.R. §§ 404.1520(b)-(g)(1), 416.920(b)-(g)(1).

The claimant has the burden of proof at steps one through four and the Commissioner has the burden of proof at step five. Bustamante, 262 F.3d at 953-54.  Additionally, the ALJ has an affirmative duty to assist the claimant in developing the record at every step of the inquiry.  Id. at 954.  If, at step four, the claimant meets his or her burden of establishing an inability to perform past work, the Commissioner must show that the claimant can perform some other work that exists in "significant numbers" in the national economy, taking into account the claimant's residual functional capacity ("RFC"), age, education, and work

13

experience.  <u>Tackett</u>, 180 F.3d at 1098, 1100; <u>Reddick</u>, 157 F.3d at 721; 20 C.F.R. §§ 404.1520(g)(1), 416.920(g)(1).  The Commissioner may do so by the testimony of a VE or by reference to the Medical-Vocational Guidelines appearing in 20 C.F.R. Part 404, Subpart P, Appendix 2 (commonly known as "the grids").  <u>Osenbrock v. Apfel</u>, 240 F.3d 1157, 1162 (9th Cir. 2001).  When a claimant has both exertional (strength-related) and non-exertional limitations, the Grids are inapplicable and the ALJ must take the testimony of a vocational expert ("VE").  <u>Moore v. Apfel</u>, 216 F.3d 864, 869 (9th Cir. 2000) (citing <u>Burkhart v. Bowen</u>, 856 F.2d 1335, 1340 (9th Cir. 1988)).

**V.**

**THE ALJ'S DECISION**

The ALJ employed the five-step sequential evaluation process and concluded that Plaintiff was not disabled within the meaning of the Social Security Act.  (AR 22-31).  At step one, the ALJ found that Plaintiff has not engaged in substantial gainful activity since April 1, 2014, her alleged onset date.  (AR 24).  At step two, the ALJ found that Plaintiff's remote history cardiovascular accident, history C5-6 fusion and multilevel degenerative changes, degenerative disc disease and degenerative joint disease lumbar spine with stenosis, atrial fibrillation status post implantation of cardiac loop recorder to rule out cardiac embolism, anxiety disorder NOS, major depressive disorder, psychological factors affecting physical condition, and cannabis use disorder are severe impairments.  (AR 24).  At step three, the

ALJ determined that Plaintiff does not have an impairment or combination of impairments that meet or medically equal the severity of any of the listings enumerated in the regulations. (AR 26-27).

The ALJ then assessed Plaintiff's RFC and concluded that she can perform light work[1] except Plaintiff is further limited to: "avoid ladders or working at unprotected heights; occasional stooping; frequently climb stairs, balance, kneel, crouch, crawl; and medium to low stress jobs, i.e., no rapid paced high quota volume." (AR 27). At step four, the ALJ found that Plaintiff is unable to perform any past relevant work. (AR 30). Based on Plaintiff's RFC, age, education, work experience, and the VE's testimony, the ALJ determined at step five that Plaintiff has acquired work skills from past relevant work that are transferable to other occupations with jobs existing in significant numbers in the national economy, including appointment clerk and telephone answering clerk. (AR 30-31). Accordingly, the ALJ found that

---

[1] "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time." 20 C.F.R. §§ 404.1567(a), 416.967(a).

Plaintiff was not under a disability, as defined by the Act, from April 1, 2014, through the date of the decision. (AR 31).

## VI.

### STANDARD OF REVIEW

Under 42 U.S.C. § 405(g), a district court may review the Commissioner's decision to deny benefits. The court may set aside the Commissioner's decision when the ALJ's findings are based on legal error or are not supported by substantial evidence in the record as a whole. Garrison v. Colvin, 759 F.3d 995 (9th Cir. 2014) (citing Stout v. Comm'r, Soc. Sec. Admin., 454 F.3d 1050, 1052 (9th Cir. 2006)); Auckland v. Massanari, 257 F.3d 1033, 1035 (9th Cir. 2001) (citing Tackett, 180 F.3d at 1097); Smolen v. Chater, 80 F.3d 1273, 1279 (9th Cir. 1996) (citing Fair v. Bowen, 885 F.2d 597, 601 (9th Cir. 1989)).

"Substantial evidence is more than a scintilla, but less than a preponderance." Reddick, 157 F.3d at 720 (citing Jamerson v. Chater, 112 F.3d 1064, 1066 (9th Cir. 1997)). It is "relevant evidence which a reasonable person might accept as adequate to support a conclusion." Id. (citing Jamerson, 112 F.3d at 1066; Smolen, 80 F.3d at 1279). To determine whether substantial evidence supports a finding, the court must " 'consider the record as a whole, weighing both evidence that supports and evidence that detracts from the [Commissioner's] conclusion.' " Auckland, 257 F.3d at 1035 (citing Penny v. Sullivan, 2 F.3d 953, 956 (9th Cir. 1993)). If the evidence can reasonably support either affirming

16

or reversing that conclusion, the court may not substitute its judgment for that of the Commissioner. <u>Reddick</u>, 157 F.3d at 720-21 (citing <u>Flaten v. Sec'y</u>, 44 F.3d 1453, 1457 (9th Cir. 1995)).

**VII.**

**DISCUSSION**

Plaintiff raises three claims for relief: (1) the ALJ failed to properly consider Plaintiff's subjective testimony; (2) the ALJ improperly rejected the medical opinion evidence; and (3) the ALJ's step-five findings are not supported by substantial evidence. (Dkt. No. 17 at 3-12). The Court addresses each claim in turn.

**A.    The ALJ's Reasons for Discrediting Plaintiff's Subjective Symptom Testimony Were Specific, Clear, and Convincing**

Plaintiff asserted that she is unable to work due to chronic, constant pain that affects her ability to sleep, dress, bathe, clean, feed herself, and take medications timely. (AR 237-39, 244). The pain in her neck, back, and feet limit her ability to lift, squat, bend, stand, reach, finger, walk, sit, kneel, climb, concentrate, understand, and remember. (AR 41, 43, 242). Plaintiff testified that she also experiences tightness in her chest, shortness of breath, frequent headaches, COPD, kidney problems, and speech issues. (AR 43-47, 55-58). Despite taking 2400mg of Neurontin daily, she alleged pain of 6-7/10. (AR 43).

Plaintiff asserted that she uses a cane to ambulate and is able to walk only 10-20 steps before needing to rest for 10-20 minutes. (AR 242-43). She testified that she has to change positions frequently in order to stay comfortable. (AR 49). She alleged that she spends most of the day either reclining or staying in bed. (AR 51). She needs a motorized cart to go grocery shopping. (AR 50-51).

When assessing a claimant's credibility regarding subjective pain or intensity of symptoms, the ALJ must engage in a two-step analysis. Trevizo v. Berryhill, 871 F.3d 664, 678 (9th Cir. 2017). First, the ALJ must determine if there is medical evidence of an impairment that could reasonably produce the symptoms alleged. Garrison, 759 F.3d at 1014. "In this analysis, the claimant is not required to show that her impairment could reasonably be expected to cause the severity of the symptom she has alleged; she need only show that it could reasonably have caused some degree of the symptom." Id. (emphasis in original) (citation omitted). "Nor must a claimant produce objective medical evidence of the pain or fatigue itself, or the severity thereof." Id. (citation omitted).

If the claimant satisfies this first step, and there is no evidence of malingering, the ALJ must provide specific, clear and convincing reasons for rejecting the claimant's testimony about the symptom severity. Trevizo, 871 F.3d at 678 (citation omitted); see also Smolen, 80 F.3d at 1284 ("[T]he ALJ may reject the claimant's testimony regarding the severity of her symptoms only if he makes specific findings stating clear and convincing reasons

18

for doing so."); <u>Robbins v. Soc. Sec. Admin.</u>, 466 F.3d 880, 883 (9th Cir. 2006) ("[U]nless an ALJ makes a finding of malingering based on affirmative evidence thereof, he or she may only find an applicant not credible by making specific findings as to credibility and stating clear and convincing reasons for each."). "This is not an easy requirement to meet: The clear and convincing standard is the most demanding required in Social Security cases." <u>Garrison</u>, 759 F.3d at 1015 (citation omitted).

In discrediting the claimant's subjective symptom testimony, the ALJ may consider the following:

> (1) ordinary techniques of credibility evaluation, such as the claimant's reputation for lying, prior inconsistent statements concerning the symptoms, and other testimony by the claimant that appears less than candid; (2) unexplained or inadequately explained failure to seek treatment or to follow a prescribed course of treatment; and (3) the claimant's daily activities.

<u>Ghanim v. Colvin</u>, 763 F.3d 1154, 1163 (9th Cir. 2014) (citation omitted). Inconsistencies between a claimant's testimony and conduct, or internal contradictions in the claimant's testimony, also may be relevant. <u>Burrell v. Colvin</u>, 775 F.3d 1133, 1137 (9th Cir. 2014); <u>Light v. Soc. Sec. Admin.</u>, 119 F.3d 789, 792 (9th Cir. 1997). In addition, the ALJ may consider the observations of treating and examining physicians regarding, among other matters,

the functional restrictions caused by the claimant's symptoms. Smolen, 80 F.3d at 1284; accord Burrell, 775 F.3d at 1137. However, it is improper for an ALJ to reject subjective testimony based "solely" on its inconsistencies with the objective medical evidence presented. Bray v. Comm'r of Soc. Sec. Admin., 554 F.3d 1219, 1227 (9th Cir. 2009) (citation omitted).

Further, the ALJ must make a credibility determination with findings that are "sufficiently specific to permit the court to conclude that the ALJ did not arbitrarily discredit claimant's testimony." Tommasetti v. Astrue, 533 F.3d 1035, 1039 (9th Cir. 2008) (citation omitted); see Brown-Hunter v. Colvin, 806 F.3d 487, 493 (9th Cir. 2015) ("A finding that a claimant's testimony is not credible must be sufficiently specific to allow a reviewing court to conclude the adjudicator rejected the claimant's testimony on permissible grounds and did not arbitrarily discredit a claimant's testimony regarding pain.") (citation omitted). Although an ALJ's interpretation of a claimant's testimony may not be the only reasonable one, if it is supported by substantial evidence, "it is not [the court's] role to second-guess it." Rollins v. Massanari, 261 F.3d 853, 857 (9th Cir. 2001).

The ALJ provided multiple, specific, clear, and convincing reasons, supported by evidence in the record, to find Plaintiff's complaints of disabling pain and mental symptomology only partially credible. (AR 28-29). These reasons are sufficient to support the Commissioner's decision.

First, the ALJ found that Plaintiff's statements were internally inconsistent. (AR 28). "[T]he ALJ may consider inconsistencies either in the claimant's testimony or between the testimony and the claimant's conduct." Molina v. Astrue, 674 F.3d 1104, 1112 (9th Cir. 2012); see Burch v. Barnhart, 400 F.3d 676, 680 (9th Cir. 2005) ("ALJ may engage in ordinary techniques of credibility evaluation, such as . . . inconsistencies in claimant's testimony"); accord 20 C.F.R. §§ 404.1529(c)(4), 416.929(c)(4). Plaintiff initially testified that her seizures are fully controlled with medication, but later testified that she had a seizure the week before, while in Georgia, and has had eight to ten other seizures over the prior year, usually while she is sleeping. (AR 28, 44, 46, 52-54). Further, in a September 2014 seizure questionnaire, Plaintiff asserted that she experiences two to three seizures every month, usually in her sleep. (AR 245). Nevertheless, as the ALJ noted, the medical record contains no reports of any seizure activities to any of her treatment providers. (AR 29). These inconsistencies diminish Plaintiff's credibility. (AR 28-29).

Second, Plaintiff's allegations were inconsistent with her acknowledged activities of daily living. (AR 26, 28). "ALJs must be especially cautious in concluding that daily activities are inconsistent with testimony about pain, because impairments that would unquestionably preclude work and all the pressures of a workplace environment will often be consistent with doing more than merely resting in bed all day." Garrison, 759 F.3d at 1016. Nevertheless, an ALJ properly may consider the claimant's daily

21

activities in weighing credibility. <u>Tommasetti</u>, 533 F.3d at 1039. If a claimant's level of activity is inconsistent with the claimant's asserted limitations, it has a bearing on credibility. <u>Garrison</u>, 759 F.3d at 1016. Here, Plaintiff asserted that her pain, arthritis, spinal stenosis, COPD, incontinence, and seizures significantly limit her ability to ambulate, restricts her to spending her day either reclining with her feet up and sitting sideways or staying in bed, and affects her ability to concentrate, remember, and understand. (AR 41, 43-47, 50-51, 55-58, 237, 242, 244; <u>see</u> <u>id.</u> 28). Nevertheless, Plaintiff was able to take a nonstop flight from Los Angeles to Georgia the week prior to her hearing. (AR 58-59; <u>see</u> <u>id.</u> 28). She also acknowledged to the consultative examiner being able to dress herself and prepare meals. (AR 437; <u>see</u> <u>id.</u> 26). Further, despite alleging problems with memory, concentration, and understanding, Plaintiff reported to the consultative examiner being able to use the internet and cell phone, and having no difficulties paying bills and managing her own funds. (AR 437; <u>see</u> <u>id.</u> 26). These acknowledged activities of daily living undermine Plaintiff's assertions of debilitating symptoms. <u>Ghanim</u>, 763 F.3d at 1165 ("Engaging in daily activities that are incompatible with the severity of symptoms alleged can support an adverse credibility determination.").

Third, the ALJ found that Plaintiff responded well to conservative treatment and medications. (AR 28-29). "Impairments that can be controlled effectively with medication are not disabling for the purpose of determining eligibility for SSI benefits." <u>Warre v. Comm'r of Soc. Sec. Admin.</u>, 439 F.3d 1001,

1006 (9th Cir. 2006).  When Plaintiff is compliant with her
medicine, her symptoms are largely ameliorated.  (AR 27-28, 317,
336-37, 403, 405, 407, 409, 422, 423, 427, 446-47, 450).  A good
response to treatment supports an adverse credibility finding.  See
Tommasetti, 533 F.3d at 1040 ("The record reflects that Tommasetti
responded favorably to conservative treatment including . . . the
use of anti-inflammatory medication [and] a transcutaneous
electrical nerve stimulation unit . . . .  Such a response to
conservative treatment undermines Tommasetti's reports regarding
the disabling nature of his pain."); Crane v. Shalala, 76 F.3d 251,
254 (9th Cir. 1996) ("evidence suggesting that [the claimant]
responded well to treatment" supports an adverse credibility
finding).  Despite Plaintiff's claims of debilitating symptoms,
there is no record of Plaintiff being evaluated by orthopedic
specialists or referred for physical therapy.  (AR 28-29).
Plaintiff's treatment at LAGS consisted primarily of medication
refills and injections.  (AR 485-531; see id. 29).  Plaintiff
acknowledged that her medications partially alleviated her pain
and denied any adverse side effects.  (AR 517).  Indeed, Plaintiff's
medication dosages were reduced after she needed less of them to
alleviate her pain.  (AR 477, 489, 502).  While Plaintiff alleged
mental health impairments (AR 242), she is not in treatment for
mental health issues and did not complain of depression or anxiety
symptoms to her treating physicians during the relevant period.
Any mental health issues appear have been successfully addressed
by the Paxil Plaintiff received from her primary care physician,
who on examination noted only a "mild" depressed mood.  (AR 441-
42, 477, 487, 489, 491, 493-94, 496-97).

Plaintiff argues that her "failure to pursue more aggressive or specialized [mental health] treatment that she cannot afford, or seek referral to specialists while not covered by insurance, is not a sufficiently clear and convincing reason to support the ALJ's adverse credibility finding." (Dkt. No. 19 at 3). However, the ALJ did not reject her subjective mental health statements because she was not seeing a specialist. Instead, the ALJ found her allegations of debilitating mental impairments incredible because her treating physicians found that her "mild" symptoms were adequately addressed with Paxil. (AR 29).

Finally, the ALJ found that Plaintiff's allegations of disabling pain and other symptoms were inconsistent with the objective medical evidence, which indicated that Plaintiff "has overstated [her] diagnoses and findings." (AR 28). While inconsistencies with the objective medical evidence cannot be the sole ground for rejecting a claimant's subjective testimony, it is a factor that the ALJ may consider when evaluating credibility. Bray, 554 F.3d at 1227; Burch, 400 F.3d at 681; Rollins, 261 F.3d at 857; see SSR 16-3p, at *5 ("objective medical evidence is a useful indicator to help make reasonable conclusions about the intensity and persistence of symptoms, including the effects those symptoms may have on the ability to perform work-related activities"). While Plaintiff asserted experiencing up to two or three seizures per month (AR 52-54, 245), she submitted no records from her neurologist evaluating her seizures (AR 28-29). Neither are there any records from her treatment providers documenting any seizure activity. (AR 29). As for Plaintiff's alleged urinary

incontinence, she made passing complaints in December 2015 and March 2016, but her complaints apparently did not concern Dr. Soroka, as no treatment was recommended. (AR 463, 465; see id. 29). As the ALJ also noted, Plaintiff's treating cardiologist observed a facial droop in October 2015, but no evidence of left-sided weakness or speech deficits. (AR 29, 441). Further, an examination was largely unremarkable. Plaintiff's gait was normal, she was neurologically intact, she had full strength in her upper and lower extremities bilaterally, and her mood, affect, judgment, and insight were all normal. (AR 444-46).

Plaintiff does not identify any relevant medical evidence overlooked by the ALJ. Instead, she contends that "there are objective bases for her reports of pain and incontinence, seen by MRI, ultrasound, and by the extensive treatment she has had." (Dkt. No. 17 at 8). However, as discussed above, the ALJ's analysis was consistent with the law and supported by specific, clear, and convincing reasons for rejecting Plaintiff's testimony. While the "evidence" cited by Plaintiff supports the various diagnoses she has received, it does not support her allegations of debilitating symptoms. The mere existence of these impairments does not provide any support for the disabling limitations alleged by Plaintiff. Indeed, "[t]he mere existence of an impairment is insufficient proof of a disability." Matthews v. Shalala, 10 F.3d 678, 680 (9th Cir. 1993); see Key v. Heckler, 754 F.2d 1545, 1549 (9th Cir. 1985) ("The mere diagnosis of an impairment . . . is not sufficient to sustain a finding of disability.").

Furthermore, the ALJ did not completely reject Plaintiff's testimony. (AR 28-29). Based partially on Plaintiff's subjective statements, the ALJ found that Plaintiff has moderate difficulties with regard to concentration, persistence, or pace. (AR 26) (citing Plaintiff's statements to the consultative examiner). The ALJ accommodated Plaintiff's anxiety and depression and her moderate difficulties in social functioning and in concentration, persistence, or pace by restricting her to medium- to low-stress jobs. (AR 24, 26, 27). The ALJ also accommodated the credible symptoms related to her degenerative disc disease and degenerative joint disease by restricting her to a limited range of light work. (AR 24-26). While these limitations preclude Plaintiff from performing any past relevant work, the VE opined that there are jobs in the national economy that Plaintiff can perform. (AR 30-31, 60-61).[2]

---

[2] Plaintiff also contends that the ALJ erred in rejecting the third-party statement from Plaintiff's niece, Ivy McDonald. (Dkt. No. 17 at 7). An ALJ is required to give germane reasons to reject lay witness testimony. Lewis v. Apfel, 236 F.3d 503, 511 (9th Cir. 2001). Here, the ALJ considered McDonald's statements and found they were duplicative of Plaintiff's testimony and contrary to the objective medical evidence. (AR 29). Indeed, McDonald's Third-Party Function Report largely mirror's Plaintiff's Adult Function Report. (Compare AR 246-53, with id. 237-44). This is a germane reason for rejecting McDonald's statements. Valentine v. Comm''r Soc. Sec. Admin., 574 F.3d 685, 694 (9th Cir. 2009) ("In light of our conclusion that the ALJ provided clear and convincing reasons for rejecting Valentine's own subjective complaints, and because Ms. Valentine's testimony was similar to such complaints, it follows that the ALJ also gave germane reasons for rejecting her testimony."). Further, "[i]nconsistency with medical evidence" is also a valid and germane reason for discounting McDonald's statements. Bayliss v. Barnhart, 427 F.3d 1211, 1218 (9th Cir. 2005).

1    In sum, the ALJ offered clear and convincing reasons,
2 supported by substantial evidence in the record, for her adverse
3 credibility findings.  Accordingly, because substantial evidence
4 supports the ALJ's assessment of Plaintiff's credibility, no remand
5 is required.

6

7 **B.    The ALJ Properly Weighed the Treating and Examining Doctors'**
8        **Opinions**

9

10    Plaintiff asserts that the ALJ erred in rejecting the
11 functional assessments of the treating and examining physicians in
12 favor of the State agency consultants.  (Dkt. No. 17 at 8-11).

13

14    An ALJ must take into account all medical opinions of record.
15 20 C.F.R. §§ 404.1527(b), 416.927(b).  The regulations "distinguish
16 among the opinions of three types of physicians: (1) those who
17 treat the claimant (treating physicians); (2) those who examine
18 but do not treat the claimant (examining physicians); and (3) those
19 who neither examine nor treat the claimant (nonexamining
20 physicians)."  Lester v. Chater, 81 F.3d 821, 830 (9th Cir. 1995),
21 as amended (Apr. 9, 1996).  "Generally, a treating physician's
22 opinion carries more weight than an examining physician's, and an
23 examining physician's opinion carries more weight than a reviewing
24 [(nonexamining)] physician's."  Holohan v. Massanari, 246 F.3d
25 1195, 1202 (9th Cir. 2001); accord Garrison, 759 F.3d at 1012.
26 "The weight afforded a non-examining physician's testimony depends
27 'on the degree to which they provide supporting explanations for

28

their opinions.' " Ryan v. Comm'r of Soc. Sec., 528 F.3d 1194, 1201 (9th Cir. 2008) (quoting 20 C.F.R. § 404.1527(d)(3)).

The medical opinion of a claimant's treating physician is given "controlling weight" so long as it "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the claimant's] case record." 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2). "When a treating doctor's opinion is not controlling, it is weighted according to factors such as the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability, and consistency with the record." Revels v. Berryhill, 874 F.3d 648, 654 (9th Cir. 2017); see also 20 C.F.R. §§ 404.1527(c)(2)-(6), 416.927(c)(2)-(6). Greater weight is also given to the "opinion of a specialist about medical issues related to his or her area of specialty." 20 C.F.R. §§ 404.1527(c)(5), 416.927(c)(5).

"To reject an uncontradicted opinion of a treating or examining doctor, an ALJ must state clear and convincing reasons that are supported by substantial evidence." Bayliss v. Barnhart, 427 F.3d 1211, 1216 (9th Cir. 2005). "If a treating or examining doctor's opinion is contradicted by another doctor's opinion, an ALJ may only reject it by providing specific and legitimate reasons that are supported by substantial evidence." Id.; see also Reddick, 157 F.3d at 725 (the "reasons for rejecting a treating doctor's credible opinion on disability are comparable to those

28

required for rejecting a treating doctor's medical opinion."). "The ALJ can meet this burden by setting out a detailed and thorough summary of the facts and conflicting clinical evidence, stating his interpretation thereof, and making findings." Trevizo, 871 F.3d at 675 (citation omitted). "When an examining physician relies on the same clinical findings as a treating physician, but differs only in his or her conclusions, the conclusions of the examining physician are not 'substantial evidence.' " Orn v. Astrue, 495 F.3d 625, 632 (9th Cir. 2007). Additionally, "[t]he opinion of a nonexamining physician cannot by itself constitute substantial evidence that justifies the rejection of the opinion of either an examining physician or a treating physician." Lester, 81 F.3d at 831 (emphasis in original). Finally, when weighing conflicting medical opinions, an ALJ may reject an opinion that is conclusory, brief, and unsupported by clinical findings. Bayliss, 427 F.3d at 1216; Tonapetyan v. Halter, 242 F.3d 1144, 1149 (9th Cir. 2001).

### 1. Dr. Soroka

In June 2016, Dr. Soroka, Plaintiff's treating physician, submitted a physical RFC questionnaire. (AR 532-36). He opined that Plaintiff's impairments would constantly interfere with the attention and concentration necessary to perform even simple tasks. (AR 533). Dr. Soroka concluded that Plaintiff can walk only ½ block before needing to rest and can sit only five minutes and stand only ten minutes before needing to switch positions. (AR 533). Plaintiff can sit, stand, or walk less than two hours in an

eight-hour workday. (AR 534). He opined that Plaintiff can rarely lift less than ten pounds and can rarely twist, stoop, crouch, squat, or climb. (AR 534-35). Dr. Soroka concluded that Plaintiff would likely miss more than four days a month due to her impairments. (AR 535).

The ALJ gave Dr. Soroka's assessment "little weight" because "it is overly restrictive and unsupported by the objective evidence of record." (AR 29). Because Dr. Soroka's opinion was contradicted by the State agency consultants' opinions, the Court reviews the ALJ's rejection of Dr. Soroka's opinion for "specific and legitimate reasons that are supported by substantial evidence." Bayliss, 427 F.3d at 1216; see Moore v. Comm'r of Soc. Sec. Admin., 278 F.3d 920, 924 (9th Cir. 2002) ("The ALJ could reject the opinions of Moore's examining physicians, contradicted by a nonexamining physician, only for specific and legitimate reasons that are supported by substantial evidence in the record.") (citation omitted). The Court finds that the ALJ provided specific and legitimate reasons, supported by substantial evidence, for rejecting Dr. Soroka's opinion.

Dr. Soroka's largely "check-off" opinion was not supported by objective or clinical evidence. Medical opinions that are inadequately explained or lack supporting clinical or laboratory findings are entitled to less weight. Crane, 76 F.3d at 253 (ALJ properly rejected "check-off reports that did not contain any explanation of the bases of their conclusions"); Johnson v. Shalala, 60 F.3d 1428, 1432 (9th Cir. 1995) (ALJ properly rejected

physician's opinion where it was "conclusory and unsubstantiated by relevant medical documentation"); see also 20 C.F.R. § 416.927(c)(3) ("The more a medical source presents relevant evidence to support a medical opinion, particularly medical signs and laboratory findings, the more weight we will give that medical opinion. The better an explanation a source provides for a medical opinion, the more weight we will give that medical opinion."). Dr. Soroka largely addressed Plaintiff's symptoms with medications, adjusting them as necessary to alleviate her pain. (AR 456-84). Physical examinations were generally unremarkable, with only mild symptoms being noted. (AR 456 (mild lumbar tenderness, no deformities), 458 (same), 467 (mild slurred speech), 469 (mood stable, judgment fair)). These examinations do not support Dr. Soroka's opinion limiting Plaintiff to rarely lifting ten pounds and being able to sit for only five minutes and walk for only ten minutes before needing to switch positions. Nor do these examinations support Dr. Soroka's opinion that Plaintiff is incapable of even low-stress jobs.

The ALJ also found that Dr. Soroka's opinion was inconsistent with Plaintiff's admission that she travelled nonstop from Los Angeles to Georgia the week before the hearing. (AR 29) ("Dr. Soroka states that [Plaintiff] can only sit 5 minutes at a time, for less than two hours in an 8-hour day; however, were such a limitation accurate, [Plaintiff] would have been unable to travel to Georgia by air travel."). The ALJ reasonable found that Plaintiff's admitted ability to exceed Dr. Soroka's assessed functional limitations weakened the value of his opinion. See

Morgan v. Comm'r of Soc. Sec. Admin., 169 F.3d 595, 600-02 (9th Cir. 1999) (recognizing that an inconsistency between a treating physician's opinion and a claimant's daily activities is a specific and legitimate reason to discount the treating physician's opinion).

Nevertheless, Plaintiff contends that the ALJ "failed to take into account any of the factors contained within 20 C.F.R. § 404.1527 for analyzing an opinion of a treating doctor." (Dkt. No. 17 at 9). "When a treating doctor's opinion is not controlling, it is weighted according to factors such as the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability, and consistency with the record." Revels, 874 F.3d at 654. However, the ALJ is not required to make an express statement that she considered all the factors outlined in 20 C.F.R. § 404.1527(c). see Harris v. Colvin, 584 F. App'x 526, 528 n.1 (9th Cir. 2014) ("The agency was not required to specifically reference each factor listed in 20 C.F.R. § 404.1527(c).") (citing SSR 06-03p, at *5) ("Not every factor for weighing opinion evidence will apply in every case."). Here, the ALJ explicitly considered the supportability of Dr. Soroka's opinion and its consistency with the record. (AR 29). Moreover, the ALJ acknowledged that Plaintiff began treating with Dr. Soroka in August 2015 and that she made multiple, periodic visits prior to Dr. Soroka's assessment in June 2016. (AR 25-26, 29).

Plaintiff also argues that an MRI indicating stenosis and right kidney atrophy "supports Dr. Soroka's opinions regarding [Plaintiff's] limitations. (Dkt. No. 17 at 9). However, "[t]he mere diagnosis of an impairment . . . is not sufficient to sustain a finding of disability." Key, 754 F.2d at 1549. Even if a claimant receives a particular diagnosis, it does not necessarily follow that the claimant is disabled, because it is the claimant's symptoms and true limitations that generally determine whether she is disabled. See Rollins, 261 F.3d at 856. Dr. Soroka cites no clinical tests in support of his extreme limitations.

Finally, Plaintiff contends that the ALJ erred by giving the greatest weight to the State agency physicians. (Dkt. No. 17 at 11). Plaintiff is correct that "[t]he opinion of a nonexamining physician cannot by itself constitute substantial evidence that justifies the rejection of the opinion of either an examining physician or a treating physician." (Dkt. No. 17 at 11) (quoting Lester, 81 F.3d at 831). Here, however, the ALJ did not reject Dr. Soroka's opinion because it was contradicted by the State agency physicians. Instead, as discussed above, the ALJ properly discounted Dr. Soroka's opinion because it was unsupported by the record and inconsistent with Plaintiff's admitted ability to travel nonstop from California to Georgia. Further, "[t]he opinions of non-treating or non-examining physicians may also serve as substantial evidence when the opinions are consistent with independent clinical findings or other evidence in the record." Thomas v. Barnhart, 278 F.3d 947, 957 (9th Cir. 2002).

The Court finds that the ALJ provided specific and legitimate reasons, supported by substantial evidence in the record, for giving Dr. Soroka's opinion little weight, and no remand is required.

**2. Dr. Kronberger**

In November 2014, Dr. Kronberger, performed a mental status examination on behalf of the Commissioner. (AR 436-39). He opined that Plaintiff was moderately inattentive on tasks and limited in her daily activities by physical condition and pain. (AR 438-39). The ALJ gave Dr. Kronberger's opinion "little weight" because "the extreme limitations therein are inconsistent with the record showing very little mental health treatment and it appears that the consultative examiner relied heavily upon [Plaintiff's] reported symptoms, which are inconsistent with other evidence . . . in the record." (AR 29). Because Dr. Kronberger's opinion was contradicted by the State agency consultants' opinions, the Court reviews the ALJ's rejection of Dr. Soroka's opinion for "specific and legitimate reasons that are supported by substantial evidence."[3] Bayliss, 427 F.3d at 1216; see Moore, 278 F.3d at 924. The Court finds that the ALJ provided specific and legitimate

_____

[3] Plaintiff argues that Dr. Kronberger's opinion was uncontradicted. (Dkt. No. 17 at 10). To the contrary, Dr. Kronberger's opinion was contradicted by the State agency consultant, who found that Plaintiff was only mildly limited in activities of daily living and was capable of both simple and semi-complex tasks. (AR 110-14).

reasons, supported by substantial evidence, for rejecting Dr. Kronberger's opinion.

Dr. Kronberger's opinion was not supported by objective or clinical evidence. Medical opinions that are inadequately explained or lack supporting clinical or laboratory findings are entitled to less weight. Johnson, 60 F.3d at 1432; 20 C.F.R. §§ 404.1527(c)(3), 416.927(c)(3). On examination, no pain-related postural adjustments were noted. (AR 437). Plaintiff's speech was intelligible and her language skills adequate for communication. (AR 437). Her thought processes were logical and coherent, she maintained eye contact, she was able to understand directions and exerted adequate effort, she did not exhibit any unusual mannerisms, but she was moderately inattentive on tasks. (AR 437-38). As the ALJ emphasized, Dr. Kronberger's opinion was inconsistent with the treatment record, which included no specialized mental health treatment and demonstrated that Plaintiff's "mild" depressed mood" was successfully addressed by the Paxil Plaintiff received from her primary care physician. (AR 29, 441-42, 477, 487, 489, 491, 493-94, 496-97).

The ALJ properly concluded that Dr. Kronberger "relied heavily on [Plaintiff's] reported symptoms." (AR 29). "An ALJ may reject a treating physician's opinion if it is based to a large extent on a claimant's self-reports that have been properly discounted as incredible." Tommasetti, 533 F.3d at 1041 (citation omitted). As discussed above, the ALJ's rejection of Plaintiff's subjective complaints was supported by substantial evidence. Here, given that

Plaintiff's allegations of disabling symptoms are otherwise unsupported in the record, it appears that Dr. Kronberger's opinion was based to a large extent on Plaintiff's self-reports and was, therefore, properly rejected by the ALJ. For example, Dr. Kronberger's conclusion that Plaintiff's "wide range of stressors . . . have aggravated her physical conditions" was based only on Plaintiff's subjective statements. (AR 439). Similarly, Dr. Kronberger's conclusion that Plaintiff was limited in her daily activities was not based on any clinical testing but was instead based entirely on Plaintiff's subjective statements. (AR 436-39). While Plaintiff contends that Dr. Kronberger's assessed limitations were "based on pain" (Dkt. No. 17 at 10), on examination, Dr. Kronberger observed "[n]o pain-related postural adjustments" (AR 437).

Plaintiff argues that the IQ test administered by Dr. Kronberger supported his opinion. (Dkt. No. 17 at 10). However, Dr. Kronberger administered only the "information" subtest of the WAIS-IV IQ test (AR 438), which merely tests the "degree of general information acquired from culture." <https://en.wikipedia.org/wiki/Wechsler_Adult_Intelligence_Scale#Verbal_IQ_(VIQ) (last visited Aug. 20, 2018). While Dr. Kronberger found that Plaintiff was in the "borderline" range on this information subtest, he also found that Plaintiff was able to understand directions, remember 5/5 words immediately and 3/5 words after a three-minute interval, and had an adequate insight, comprehension, attention span, conceptualization skills, and understanding of social norms. (AR 438). Further, Dr. Kronberger did not diagnose Plaintiff with any

intellectual disorder or limit the complexity of tasks she could perform. Thus, Dr. Kronberger did not find Plaintiff as limited as she suggests.

The Court finds that the ALJ provided clear and convincing reasons, supported by substantial evidence in the record, for giving Dr. Kronberger's opinion little weight, and no remand is required.

**3. Dr. Rao**

Plaintiff contends that "[t]he ALJ further erred by ignoring [treatment] notes from Dr. Rao, treating provider," who "documented [Plaintiff's] speech impairment." (Dkt. No. 17 at 9). However, because Dr. Rao did not provide a medical opinion, the ALJ was not required to explain what probative value she gave to Dr. Rao's treatment notes. Cf. 20 C.F.R. § 404.1527(a)(1) ("Medical opinions are statements from acceptable medical sources that reflect judgments about the nature and severity of your impairment(s), including your symptoms, diagnosis and prognosis, what you can still do despite impairment(s), and your physical or mental restrictions."). Further, the ALJ did not "ignore" Dr. Rao's treatment notes. Indeed, the ALJ specifically discussed Dr. Rao's cardiology consultation, including that Plaintiff was feeling reasonably well in October 2015 and that a physical examination was generally unremarkable. (AR 24, 29; see id. 441, 443, 445). Finally, with regard to Plaintiff's alleged speech impairment, Dr. Rao explicitly observed no speech deficits on October 30, 2015.

(AR 441).  Moreover, Dr. Kronberger observed that Plaintiff's
speech was intelligible and concluded that Plaintiff's "expressive
language skills were adequate for communication."  (AR 437).  No
remand is required based upon the ALJ's consideration of Dr. Rao's
opinions.

## C.    ALJ's Step Five Finding Is Supported By Substantial Evidence

     Based on the VE's testimony, the ALJ found that Plaintiff
could not perform her past relevant work as a telemarketer, but
that she had transferable skills - using the telephone for business
purposes; providing customer service; and providing, obtaining,
and recording information – to two other occupations: appointment
clerk and telephone answering clerk.  (AR 30-31; see id. 59-61).
Plaintiff contends that the ALJ and the VE "did not employ the
standard for evaluating transferable skills." (Dkt. No. 17 at 11).

     At step five of the sequential evaluation process, "the
Commissioner has the burden to identify specific jobs existing in
substantial numbers in the national economy that a claimant can
perform despite his identified limitations." Zavalin v. Colvin,
778 F.3d 842, 845 (9th Cir. 2015) (citation omitted).  In making
this finding, the ALJ determines "whether, given the claimant's
RFC, age, education, and work experience, he actually can find some
work in the national economy." Zavalin, 778 F.3d at 846 (citation
omitted); see also 20 C.F.R. § 404.1520(g) ("we will consider [your
RFC] together with your vocational factors (your age, education,
and work experience) to determine if you can make an adjustment to

other work"). The Commissioner may meet this burden by adopting the testimony of a VE or by reference to the Grids. Osenbrock, 240 F.3d at 1162. "In making this determination, the ALJ relies on the [Dictionary of Occupational Titles (DOT)], which is the [Agency's] primary source of reliable job information regarding jobs that exist in the national economy." Zavalin, 778 F.3d at 845-46 (citation omitted); see 20 C.F.R. § 404.1566(d)(1) (noting that the Agency "will take administrative notice of reliable job information available from various governmental and other publications," including the DOT); SSR 00-4p, at *2 ("In making disability determinations, [the Agency relies] primarily on the DOT . . . for information about the requirements of work in the national economy."). Further, "[w]hen a VE . . . provides evidence about the requirements of a job or occupation, the [ALJ] has an affirmative responsibility to ask about any possible conflict between that VE . . . evidence and information provided in the DOT." SSR 00-4p, at *4.

The regulations provide that skills will be considered transferable "when the skilled or semi-skilled work activities you did in past work can be used to meet the requirements of skilled or semi-skilled work activities of other jobs." 20 C.F.R. § 404.1568(d)(1). "A finding of transferability is most probable among jobs that involve: (1) the same or lesser degree of skill; (2) a similarity of tools; and (3) a similarity of services or products." Renner v. Heckler, 786 F.2d 1421, 1423 (9th Cir. 1986) (citing 20 C.F.R. § 404.1568(d)(2)). "Complete similarity of skills, however, is not necessary." Renner, 786 F.2d at 1423

(citing 20 C.F.R. § 404.1568(d)(3)).  "When the issue of skills and their transferability must be decided, the . . . ALJ is required to make certain findings of fact and include them in the written decision."  SSR 82-41, at *7.

Here, the ALJ's determination that Plaintiff's skills are transferable to the positions of appointment clerk and telephone answering clerk is supported by substantial evidence.  The appointment clerk and telephone answering clerk positions would not require Plaintiff to use a greater degree of skill than the telemarketer position previously held.  The DOT classifies all three occupations as SVP 3, or "semi-skilled."[4]  (AR 30-31, 59-61); see Aldrich v. Barnhart, 151 F. App'x 561, 562-63 (9th Cir. 2005) ("The credit clerk and mortgage clerk positions would not require Aldrich to use a greater degree of skill than jobs that she has previously held.  A credit clerk is an SVP4 position, and a mortgage clerk is an SVP5 position.  The VE testified that Aldrich developed her skills in part while working as a customer service supervisor, and stated that this was an SVP7 position.") (citation and footnote omitted).  Further, although Plaintiff contests the sufficiency of the VE's testimony, she offered no evidence to contradict the VE's. Osenbrock, 240 F.3d at 1163 (uncontradicted evidence by VE of transferable skills constitutes substantial evidence); see also

---

[4]  A job's specific vocational preparation ("SVP") rating "speak[s] to the issue of the level of vocational preparation necessary to perform the job."  Meissl v. Barnhart, 403 F. Supp. 2d 981, 983 (C.D. Cal. 2005) (citation omitted); see Bray, 554 F.3d at 1233 (noting that an SVP level of "3" corresponds to a "semi-skilled position).

<u>Bayliss v. Barnhart</u>, 427 F.3d 1211, 1218 (9th Cir. 2005) ("A VE's recognized expertise provides the necessary foundation for his or her testimony.").

Plaintiff contends that "the VE did not specifically testify to and the ALJ did not state whether being an appointment clerk or telephone answering clerk uses the same or similar tools and machines; and whether the same or similar raw materials, product, processes, or services are involved." (Dkt. No. 17 at 11). Plaintiff arguably waived this issue by not raising it at the administrative level, where it could have been addressed by the VE. <u>Meanel v. Apfel</u>, 172 F.3d 1111, 1115 (9th Cir. 1999), <u>as amended</u> (June 22, 1999) ("We now hold that, at least when claimants are represented by counsel, they must raise all issues and evidence at their administrative hearings in order to preserve them on appeal."). In any event, a plain reading of the DOT demonstrates the multiple similarities between Plaintiff's past work as a telemarketer, DOT 299.357-014 (soliciting orders over telephone, calling prospective customers, recording information), and the appointment clerk, DOT 237.367-010 (scheduling appointments, recording information, calling with reminders of appointments), and telephone answering clerk, DOT 235.662-026 (greeting callers, recording messages, placing telephone calls), occupations. <u>See</u> http://www.govtusa.com/dot last visited Aug. 20, 2018). Contrary to Plaintiff's argument, the mere fact that the positions have some differences and do not have identical skill sets does not undermine the ALJ's transferability finding. Indeed, "[a] complete similarity of all three factors is not necessary for

transferability."  20 C.F.R. § 404.1568(d)(3); see Volkerts v. Comm'r Soc. Sec. Admin., 158 F. App'x 916, 917-18 (9th Cir. 2005) ("The similarities in skills between past and potential jobs need not be very close in every possible aspect.").

Plaintiff also asserts a conflict between the ALJ's assessed RFC and her ability to perform either the appointment clerk or the telephone answering clerk. (Dkt. No. 17 at 12). She argues that these two positions would be too stressful for someone limited to medium- to low-stress jobs. (Id.). However, the ALJ specifically defined "medium to low stress jobs" as those with "rapid paced high quota volume." (AR 27, 60). Accordingly, while the VE found that Plaintiff's past relevant work as a telemarketer involved quotas, she explicitly determined that neither the appointment clerk nor the telephone answering clerk position involved rapid paced, high quota volume. (AR 61). See Osenbrock, 240 F.3d at 1163 (uncontradicted testimony by VE constitutes substantial evidence).

Plaintiff has not identified any "apparent or obvious" conflict in the step-five analysis. The ALJ must address a discrepancy only where there is an "obvious or apparent" conflict between the VE's testimony and the DOT. Gutierrez v. Colvin, 844 F.3d 804, 808 (9th Cir. 2016) ("For a difference between [the VE's] testimony and the [DOT's] listings to be fairly characterized as a conflict, it must be obvious or apparent. This means that the testimony must be at odds with the [DOT's] listing of job requirements that are essential, integral, or expected."). Plaintiff argues that because the appointment clerk position

involves "scheduling" and the telephone clerk involves "locating client in emergencies," these occupations are "higher stress than [her RFC] could accommodate." (Dkt. No. 17 at 12). However, these job descriptions do not "obviously" involve "rapid paced, high quota volume." As such, there was no apparent conflict presented by the VE's testimony and any alleged error constituted harmless error. Hartley v. Colvin, 672 F. App'x 743, 744 (9th Cir. 2017) ("Accordingly, there were no unexplained inconsistencies, and the ALJ's failure to ask the VE about potential conflicts with the DOT constituted harmless error.") (citing Massachi v. Astrue, 486 F.3d 1149, 1154 n.19 (9th Cir. 2007)).

In sum, the ALJ did not err in finding, at step five, that Plaintiff had acquired skills from her past telemarketing position that were transferable to other occupations with specific jobs existing in substantial numbers in the national economy. See Rounds v. Comm'r Soc. Sec. Admin., 807 F.3d 996, 1002 (9th Cir. 2015). The ALJ made sufficient findings, supported by substantial evidence, by identifying the specific transferable work skills that Plaintiff had acquired and the specific occupations to which they were transferable. Plaintiff has failed to show an obvious conflict between the VE's testimony and that the DOT, and no remand is required.

**VIII.**

**CONCLUSION**

Consistent with the foregoing, IT IS ORDERED that Judgment be entered AFFIRMING the decision of the Commissioner. The Clerk of the Court shall serve copies of this Order and the Judgment on counsel for both parties.

DATED: August 20, 2018

_____
/S/
SUZANNE H. SEGAL
UNITED STATES MAGISTRATE JUDGE

**THIS DECISION IS NOT INTENDED FOR PUBLICATION IN WESTLAW, LEXIS/NEXIS OR ANY OTHER LEGAL DATABASE.**